**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Rene Hamilton, | : | Case No. 3:10 CV 1997 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Menard, Inc., et al, | : | **MEMORANDUM OPINION** |
| Defendant, | : | **AND ORDER** |

### I. INTRODUCTION

Defendant Menard, Inc. ("Defendant") seeks to strike or disregard the sworn statement and report from Plaintiff Rene Hamilton's ("Plaintiff") retained medical expert, James Lundeen Sr., M.D. ("Dr. Lundeen"), on the ground that Dr. Lundeen does not qualify as an expert in Complex Regional Pain Syndrome ("CRPS")[1] under the provisions set forth in Federal Rule of Evidence 702 (Docket No. 29). On August 19, 2011, the parties consented to have this case transferred to the undersigned Magistrate for further proceedings, including trial (Docket No. 30). On October 18, 2011, the Magistrate presided over a *Daubert* hearing, as ordered by Judge

---

[1] CRPS was previously known as Reflex Sympathetic Dystrophy ("RSD"). These two terms are often used interchangeably and Plaintiff's alleged condition is described as both CRPS and RSD throughout the entire record. For purposes of this opinion, this Magistrate will refer to Plaintiff's alleged condition as CRPS.

Jack Zouhary on August 19, 2011, to determine the admissibility of Dr. Lundeen's opinion

(Docket No. 32).

Pending is Defendant's Motion to Strike or Disregard the Sworn Statement and Report of

Dr. Lundeen, filed July 19, 2011 (Docket No. 29), and Plaintiff's Response in Opposition, filed

July 28, 2011 (Docket No. 31). For the reasons that follow, the Magistrate grants Defendant's

Motion to Strike.

## II.  FACTUAL BACKGROUND

Plaintiff and Defendant present different versions of Plaintiff's actual accident and

resulting injury, summarized as follows. According to Plaintiff, on April 5, 2008, she was

shopping at one of Defendant's stores in Oregon, Ohio (Docket No. 25, Attachment 6, p. 1 of 9).

Upon entering the store through its Garden Shop entrance, Plaintiff alleges she made her way to

a display of a black metal or plastic planters, located on a top shelf (Docket No. 25, Attachment

6, p. 1 of 9). While she was looking at the planters, a nearby display of white wrought iron

fencing began to slide off of its place on the shelf (Docket No. 25, Attachment 6, p. 2 of 9).

Plaintiff stated she stuck her left arm out to protect her body "from being hit by the fencing

falling helter-skelter" (Docket No. 25, Attachment 6, p. 2 of 9). Plaintiff alleges six to eight

pieces of fencing hit her head, while one piece struck her left arm, wrist, and hand (Docket No.

25, Attachment 6, p. 2 of 9). Plaintiff claims that after store personnel attended to the situation,

they offered her a band-aid (Docket No. 25, Attachment 6, p. 2 of 9).

Defendant's assistant hardware department manager, Jake Bandle ("Mr. Bandle") swore

to a slightly different version of events. Mr. Bandle stated Plaintiff was shopping in Defendant's

Oregon store on the date of its grand opening (Docket No. 23, Attachment 1, p. 2 of 5). At the

time of Plaintiff's incident, Mr. Bandle was working in the garden center watering plants
(Docket No. 23, Attachment 1, p. 2 of 5). Hearing a noise, Mr. Bandle responded and saw
Plaintiff holding her left hand and one plant stand on the ground (Docket No. 23, Attachment 1,
p. 2 of 5). Mr. Bandle inquired as to what had happened and asked Plaintiff if she was all right
(Docket No. 23, Attachment 1, p. 2 of 5). Mr. Bandle stated Plaintiff told him she was reaching
for a planter off the shelf when a stack of plant stands next to her came down, with "one stand
hitting the top of her left hand between her thumb and wrist" (Docket No. 23, Attachment 1, p. 2
of 5). Mr. Bandle stated that, although he did not see any blood or a puncture wound, he did see
what appeared to be a small red welt on the top of Plaintiff's left hand (Docket No. 23,
Attachment 1, p. 2 of 5). Mr. Bandle also stated he saw redness on Plaintiff's face but that
Plaintiff denied being struck in the head by the falling merchandise (Docket No. 23, Attachment
1, p. 2 of 5). Mr. Bandle stated he took Plaintiff to see Deb Martin ("Ms. Martin"), Defendant's
front end manager, to fill out an incident report (Docket No. 23, Attachment 1, pp. 2-3 of 5). Ms.
Martin also asked Plaintiff if she had been hit in the head (Docket No. 23, Attachment 1, p. 3 of
5). Again, Plaintiff said no (Docket No. 23, p. 3 of 5).

     In his affidavit, Mr. Bandle described the layout of the garden center, specifically the
shelves and merchandise in question. According to Mr. Bandle, the plant stands were located on
the second shelf from the top at eye level, approximately five feet off the ground (Docket No. 23,
Attachment 1, p. 3 of 5).[2] The stands were in an open container box and the top of the box was
behind and underneath the bottom lip of the top shelf to keep the box and the product in place
(Docket No. 23, Attachment 1, p. 3 of 5). Mr. Bandle stated the maximum height of the end cap

---

[2] Plaintiff stands approximately 5'4" tall (Docket No. 25, Attachment 3, p. 62 of 63).

3

unit was and has always been eight feet, making the top shelf of the unit approximately seven

feet above the ground (Docket No. 23, Attachment 1, p. 3 of 5).

Both parties agree that Plaintiff drove herself to the Emergency Room at St. Charles

Mercy Hospital. Emergency room records indicate Plaintiff presented with complaints of a left

hand or wrist injury, claiming a piece of  "wrought iron fenc[e] fell off a shelf and hit her in the

hand (Docket No. 23, Attachment 2, p. 2 of 8). Plaintiff complained of "numbness and tingling

in her third and fourth digit of her left hand" (Docket No 23, Attachment 2, p. 2 of 8). X-rays

were taken of Plaintiff's hand to rule out the possibility of a fracture (Docket No. 23, Attachment

2, pp. 2-3 of 8). It was determined Plaintiff had no fracture and Plaintiff was diagnosed with a

left hand contusion and abrasion (Docket No. 23, Attachment 2, p. 3 of 8). Plaintiff was given a

tetanus shot and a splint for her hand and wrist and was discharged (Docket No. 23, Attachment

2, p. 3 of 8).

Plaintiff saw or had her medical records reviewed by several doctors in the months

following the incident including: (1) her primary care doctor, Dr. Joseph Thompson ("Dr.

Thompson") (Docket No. 25, Attachment 3, p. 32 of 63); (2) orthopedist Dr. David Beeks ("Dr.

Beeks") (Docket No. 25, Attachment 3, pp. 49-57 of 63); (3) neurologists Drs. Mark Loomus

("Dr. Loomus") (Docket No. 25, Attachment 3, pp. 32-37 of 63), Timothy Hickey ("Dr.

Hickey") (Docket No. 25, Attachment 3, pp. 58-62 of 63), Richard Trosch ("Dr. Trosch")

(Docket No. 23, Attachment 3, pp. 1-29 of 29), and James Sander ("Dr. Sander") (Docket No.

23, Attachment 3, pp. 1-29 of 29); and (4) pain management specialist/anesthesiologist Dr.

Stephen Minore ("Dr. Minore") Docket No. 23, Attachment 4, pp. 1-21 of 21). On June 25,

2008, Dr. Loomus recommended Plaintiff undergo a bone scan of her left upper extremity

(Docket No. 25, Attachment 3, p. 33 of 63). On July 17, 2008, Plaintiff underwent a bone

imaging scan at St. Charles Hospital (Docket No. 23, Attachment 2, p. 5 of 8). The scan revealed

"rather asymmetric arthritis changes . . . . There [was] no indication of increased flow [or] blood

pool to indicate reflex sympathy dystrophy to the left upper arm extremity" (Docket No. 23,

Attachment 2, p. 5 of 8).

Plaintiff subsequently underwent a CT scan of her cervical spine (Docket No. 23,

Attachment 2, p. 6 of 8). The scan revealed "osteophyte formation and disc herniation at C5-C6

and C6-C7, effacing the anterior aspect of the underlying cervical cord and thecal sac" (Docket

No. 23, Attachment 2, p. 6 of 8). On August 28, 2008, Plaintiff underwent a CT lumbar and

sacrum scan (Docket No. 23, Attachment 2, p. 7 of 8). The impression was "multilevel

degenerative disc disease and facet joint osteoarthritis with spinal canal and foraminal narrowing

at multiple levels" (Docket No. 23, Attachment 2, pp. 7-8 of 8).

On October 8, 2008, Plaintiff attended a follow-up appointment with Dr. Loomus

(Docket No. 25, Attachment 3, pp. 34-35 of 63). At that time, Dr. Loomus noted Plaintiff's

> deltoid, biceps, and brachioradialis muscles on the left have normal strength with
> first effort, but there is some collapse weakness. There is a marked dystonia with left
> triceps movements. That is, when she tried to extend her left elbow she ends up
> internally rotating the shoulder and abducting the arm. This is chronic as she has
> always had that problem. She has no left wrist extension but this is also chronic due
> to her AVM. With attempted flexion of the left fingers and left thumb, there are some
> dystonic movements of the forearm and wrist. This is also true with attempted left
> knee flexion and left foot dorsiflexion more than plantar flexion . . . All of these
> dystonic contractures are chronic and old. The inability to elevate or extend the left
> wrist is chronic and old and predates her injury.
>
> However, she has marked pain with attempted left forearm extension (triceps) which
> is new. There is some allodynic pain with light touch of the left distal forearm
> towards the wrist, by the radial aspect. All of these pain issues are new.

(Docket No. 25, Attachment 3, pp. 34-35 of 63). On October 21, 2008, Dr. Beeks diagnosed

5

Plaintiff with "some cervical degenerative disc disease, cervical stenosis at C5-6 and C6-7 . . .

predominantly on the right hand side" (Docket No. 25, Attachment 3, p. 54 of 63). Dr. Beeks

stated he did "not believe [Plaintiff's symptoms or diagnosis were] related to her injury at

Menard's and her symptoms from this [were] largely resolved" (Docket No. 25, Attachment 3, p.

54 of 63). He recommended physical therapy and pain management (Docket No. 25, Attachment

3, pp. 54, 56 of 63).

       Sometime in 2009, Dr. Loomus referred Plaintiff to Dr. Trosch, a neurologist with a

speciality in movement disorders, for a neurologic consultation (Docket No. 23, Attachment 3,

pp. 2-5 of 29). In his February 23, 2009, report, Dr. Trosch noted Plaintiff was on a significant

number of medications and had a rather lengthy medical history (Docket No. 23, Attachment 3,

pp. 6-8 of 29). Dr. Trosch suggested Plaintiff suffered from a conversion disorder and stated he

did "not believe that trauma to her left arm [was] responsible for her left arm pain or any

movement disorder" (Docket No. 23, Attachment 3, p. 8 of 29). Dr. Trosch recommended

Plaintiff seek out the care of a psychologist or therapist to work on her psychological problems

(Docket No. 23, Attachment 3, p. 8 of 29). He also specifically stated Plaintiff's "physical exam

[did] not support a diagnosis of causalgia or CRPS" (Docket No. 23, Attachment 3, p. 8 of 29).

       On March 31, 2011, Dr. Minore reviewed Plaintiff's medical records, including her pre-

accident records (Docket No. 23, Attachment 4, pp. 17-21 of 21). Dr. Minore concluded, to a

reasonable degree of medical and surgical certainty and probability that Plaintiff "never had

CRPS, never injured her neck, shoulder, forearm, or elbow when this piece of fencing or grate

fell, and has a significant psychiatric somatoform disorder as a result of her protracted abuse,

both physical and sexual, as a child at the hands of other family members" (Docket No. 23,

6

Attachment 4, p. 20 of 21) (emphasis in original). On April 1, 2011, after reviewing Plaintiff's medical records, Dr. Sander performed an Independent Medical Examination ("IME") of Plaintiff (Docket No. 23, Attachment 5, pp. 10-11 of 11). According to Dr. Sander, Plaintiff "has evidence of symptom augmentation on her examination. She has an otherwise normal neurological examination other than her depressed affect. There is no objective evidence of reflex sympathetic dystrophy (CRPS 1 or 2)" (Docket No. 23, Attachment 5, p. 11 of 11).

Plaintiff was referred to Dr. Lundeen by her attorney on February 11, 2011 (Docket No. 37, Attachment 4, p. 1 of 14).[3] The purpose of the appointment was for Dr. Lundeen to review Plaintiff's supplied medical records and conduct an IME (Docket No. 37, Attachment 1, p. 1 of 14). Dr. Lundeen reviewed some, although not all, of Plaintiff's post-accident medical records (Docket No. 25, Attachment 4, pp. 1-19 of 19). By his own admission, Dr. Lundeen did not review any of Plaintiff's pre-accident medical records prior to conducting his examination or issuing his report (Docket No. 37, Attachment 1, pp. 20-21 of 237). Based on his review and examination, Dr. Lundeen concluded Plaintiff was suffering from CRPS (Docket No. 37, Attachment 4, pp. 12-14 of 14).

Plaintiff saw Dr. Lundeen for a follow-up visit on May 9, 2011 (Docket No. 37, Attachment 1, p. 42 of 237). At that visit, Dr. Lundeen attempted to use an electronic device to measure a difference in temperature between Plaintiff's arms, allegedly to confirm his diagnosis of CRPS (Docket No. 37, Attachment 1, p. 42 of 237). Dr. Lundeen was unable to determine an objective measurable difference in temperature between Plaintiff's extremities (Docket No. 37,

---

[3] In his sworn statement, taken on June 14, 2011, Dr. Lundeen indicated he saw Plaintiff on April 5, 2011 (Docket No. 25, Attachment 1, p. 9 of 19). This date does not match any other document contained in the record.

Attachment 1, p. 44 of 237).

### III. PROCEDURAL HISTORY

Plaintiff first filed an action against Defendant in the Common Pleas Court of Lucas County, Ohio (Docket No. 1, p. 1 of 4). The case was removed to the United States District Court for the Northern District of Ohio, Western Division, on December 29, 2008, assigned to Judge Jack Zouhary, and given Case Number 3:08 CV 3018 (Docket No. 1, p. 2 of 4). On July 24, 2009, during a telephone status conference, Plaintiff voluntarily withdrew her complaint and the case was dismissed without prejudice on July 27, 2009 (Docket No. 1, Attachment 1, p. 5 of 5).

Plaintiff refiled her complaint *pro se* on July 27, 2010, in the Common Pleas Court of Lucas County, Ohio (Docket No. 1, p. 2 of 4). Defendant was never served with this Complaint (Docket No. 1, p. 2 of 4). On August 26, 2010, Plaintiff filed her First Amended Complaint (Docket No. 1, p. 2 of 4). The summons and Plaintiff's First Amended Complaint were served on Defendant on September 2, 2010 (Docket No. 1, p. 2 of 4). This case was subsequently removed to the United States District Court for the Northern District of Ohio, Western Division on September 8, 2010 (Docket No. 1, p. 2 of 4). Defendant filed its Answer on September 14, 2010 (Docket No. 3). On February 2, 2011, Attorney Arthur C. Graves entered his appearance on behalf of Plaintiff (Docket No. 14). On February 28, 2011, Plaintiff made an initial disclosure of her intended expert witnesses, including Dr. Lundeen (Docket No. 17).

On May 27, 2011, Defendant filed a Motion for Partial Summary Judgment, alleging no genuine issue of material fact regarding Plaintiff's belief or allegation that she suffered from CRPS (Docket No. 23). Plaintiff filed her motion in opposition on June 26, 2011 (Docket No.

25). Defendant filed its Reply in Support on July 15, 2011 (Docket No. 27). On July 19, 2011,

Defendant filed a Motion to Strike or to Disregard the Sworn Statement and Report of Dr.

Lundeen (Docket No. 29), alleging Dr. Lundeen does not qualify as an expert by knowledge,

skill, experience, training or education as required by Fed. R. Evid. 702 (Docket No. 27, pp. 1-2

of 2).

      Plaintiff filed her Response to Defendant's Motion to Strike on July 28, 2011 (Docket

No. 31). On August 19, 2011, Judge Zouhary issued a Memorandum Opinion and Order

regarding Defendant's Motion for Partial Summary Judgment and Motion to Strike (Docket No.

32). After a review of the record, Judge Zouhary denied both motions, stating more information

was needed before a final decision could be made (Docket No. 32). Citing the Court's doubts as

to Dr. Lundeen's qualifications and methodology, Judge Zouhary ordered the undersigned

Magistrate to conduct a *Daubert* hearing on the admissibility of Dr. Lundeen's opinion (Docket

No. 32, p. 5 of 5). Judge Zouhary also, with the parties' consent, issued an order transferring this

case to the undersigned Magistrate.

      Dr. Lundeen's deposition took place on September 21, 2011, at his office in Plymouth,

Ohio (Docket No. 34). A *Daubert* hearing was conducted before the undersigned Magistrate on

October 18, 2011. This case is currently set for trial on January 16, 2013, at 9:00 a.m. in front of

the undersigned Magistrate (Docket No. 42).

## IV. APPLICABLE LAW

      Fed. R. Evid. 104(a) requires a trial court to decide "any preliminary question about

whether a witness is qualified." This includes preliminary questions regarding the admissibility

of expert testimony under Fed. R. Evid. 702. Rule 702 is the touchstone for expert testimony and

governs not only *when* the assistance of an expert witness is proper, but also *who* may be qualified as an expert and upon what foundation his opinion or testimony must be based. The Rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharm., Inc.* (509 U.S. 579 (1993)), the United States Supreme Court assigned the trial court a gatekeeping function with regard to admitting expert *scientific* testimony. 509 U.S. at 589. The Court surmised that, unlike lay testimony, which must be based on first-hand knowledge or observation, under Federal Rule of Evidence 701, expert testimony is given wide latitude. *Id*. at 592. The relaxation of the first-hand knowledge requirement necessitates an expert's opinion be grounded in both relevance and reliability. *Id*. at 591-92. Proposed testimony must therefore "be supported by appropriate validation – *i.e.* 'good grounds,' based on what is known." *Id*. at 590. The Supreme Court later expanded this gatekeeping function to encompass *all* expert testimony, scientific or otherwise. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

As a preliminary matter, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This requirement has always been treated liberally; however, such interpretation "does not mean that a witness is an expert simply because he claims to be." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000).  A trial court must examine "not the qualifications of a witness in the abstract, but whether those qualifications

10

provide a foundation for the witness to answer a specific question." *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (*citing Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)); *see also Kumho*, 526 U.S. at 156 ("The trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case."). A witness may be qualified by experience alone. *United States v. Cunningham*, 679 F.3d 355, 378 (6th Cir. 2012). However, may does not mean must. *Id*. "Whether a proposed expert's experience is sufficient to qualify . . . [him] to offer an opinion on a particular subject depends on the nature and extent of that experience." *Id*. at 379.

Qualifying a witness as an expert is only the first hurdle a party must clear under Rule 702. An expert's proposed testimony must also be: (1) "relevant, meaning that the testimony 'will help the trier of fact to understand the evidence or to determine a fact in issue,'" and (2) reliable." *Cunningham*, 679 F.3d at 379-80 (*citing* Fed. R. Evid. 702). For the former, expert testimony must "fit" the facts of the case, that is, "there must be a connection between the scientific research or test being offered and the disputed factual issues in the case in which the expert will testify." *Pride*, 218 F.3d at 578 (*citing Daubert*, 509 U.S. at 591).

With regard to reliability, it is the burden of the moving party "to establish by a preponderance of evidence that [the] expert's theories are reliable and adequately supported by sound technical data, methodology and testing." *Smelser*, 105 F.3d at 303. This inquiry is flexible: there is no definitive or exhaustive list of factors to take into consideration. *Daubert*, 509 U.S. at 593. Rather, the inquiry's "overarching subject is the scientific validity . . . of the principles that underlie a proposed submission. The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id*. at 595. An expert who presents

11

testimony must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Proposed factors include, but are not limited to, "whether the theory or technique in question 'can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' whether it has a 'known or potential rate of error,' and whether the theory or technique enjoys 'general acceptance' in the 'relevant scientific community.'" *Newell Rubbermaid, Inc., v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (*citing Daubert*, 509 U.S. at 593-94).

A trial court must watch for certain "red flags," those things which, if present, may caution against certifying a witness as an expert. *Newell*, 676 F.3d at 527. These "red flags" include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing . . . subjectivity . . . [and] if a purported expert's opinion was prepared solely for litigation." *Id*.

## V. ANALYSIS

### A. PARTIES' ARGUMENTS

Defendant alleges Dr. Lundeen does not meet the requisite standard to be qualified as an expert witness (Docket No. 27). Specifically, Defendant states: (1) Dr. Lundeen is a general practitioner, not a specialist, whose primary focus is workers compensation matters; (2) Dr. Lundeen is not involved in any of the medical specialities that typically diagnose CRPS; and (3) Dr. Lundeen has not had a valid Ohio medical license since being suspended on May 11, 2011 (Docket No. 27, Attachment 1, pp. 1-6 of 13).

Plaintiff disagrees, alleging Dr. Lundeen is more than just a "general practice doctor" (Docket No. 31, p. 3 of 6). According to Plaintiff, Dr. Lundeen is a board certified physician

which allows him "to perform independent medical and impairment evaluations according to the profession's performance standards" (Docket No. 31, p. 3 of 6). Plaintiff claims Dr. Lundeen has performed thousands of workers compensation and Medicare disability examinations since 1990 and treated approximately 800 patients (Docket No. 31, p. 3 of 6). Finally, Plaintiff claims Dr. Lundeen has both diagnosed and treated patients with CRPS in the past, including "several" in 2011 (Docket No. 31, p. 3 of 6).

Based upon the evidence in the record, including, but not limited to: (1) evidence from Plaintiff's numerous treating and examining physicians, both before and after the accident; (2) the sworn statement of Dr. Lundeen (Docket No. 25, Attachment 1); (3) Dr. Lundeen's Curriculum Vitae ("CV") (Docket No. 25, Attachment 2); (4) Dr. Lundeen's final report regarding Plaintiff (Docket No. 37, Attachment 4); and (5) the transcript of Dr. Lundeen's deposition (Docket No. 37, Attachment 1), this Magistrate finds Dr. Lundeen does not qualify as an expert as required under Federal Rule of Evidence 702. Furthermore, even if Dr. Lundeen were to qualify as an expert, this Magistrate finds his report and testimony fail to meet the reliability criteria set forth in *Daubert*.

## B. DR. LUNDEEN'S QUALIFICATIONS

As a preliminary matter, a witness proffered as an expert must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. It has long been noted that Rule 702 was drafted broadly, generally "relaxing the traditional barriers to opinion testimony" where expert testimony is concerned. *Daubert*, 509 U.S. at 588 (internal citations omitted). The "language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of knowledge, skill, experience, training, or education qualify an expert

13

as such." *In re Heparin Prods. Liab. Litig.*, 803 F.Supp.2d 712, 731 (N.D. Ohio 2011) (*citing In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) (internal citations omitted). However, this liberal interpretation "does not mean that a witness is an expert simply because he claims to be." *Pride*, 218 F.3d at 577. Based on the evidence presented, Dr. Lundeen possesses neither the knowledge, skill, experience, training, or education required to qualify him as an expert in CRPS.

Dr. Lundeen earned his M.D. from the University of Health Sciences at The Chicago Medical School in 1983 (Docket No. 25, Attachment 2, p. 1 of 4). At the time of Plaintiff's examination and the subsequent *Daubert* hearing, Dr. Lundeen was certified by the American Board of Independent Medical Examiners ("ABIME") as an independent medical examiner (Docket No. 25, Attachment 2, p. 1 of 4). Dr. Lundeen maintained his practice in twelve locations throughout Ohio (Docket No. 37, Attachment 4, p. 1 of 4), some being established medical offices where Dr. Lundeen operated on a per diem basis, and some being local hospitals where he held courtesy access (Docket No. 37, Attachment 1, pp. 34-38 of 237). By his own admission, Dr. Lundeen has never held actual hospital privileges (Docket No. 37, Attachment 1, p. 52 of 237).

In addition to being certified by ABIME, Dr. Lundeen was associated with several professional groups/societies at some point in his career, including the American Medical Association and the Ohio State Medical Association (Docket No. 25, Attachment 2, p. 2 of 4). Dr. Lundeen admitted in his deposition that he was not current with any of his medical association dues (Docket No. 37, Attachment 1, p. 53 of 237).

As stated by Drs. Minore and Sander, CRPS is usually diagnosed by a physician who

14

specializes in neurosurgery, anesthesia, interventional pain management, neurology, orthopedics, or physical medicine and rehabilitation (Docket Nos. 23, Attachment 4, p. 20 of 21; Attachment 5, p. 9 of 11). Dr. Lundeen lacks any of this formal education. According to his CV, Dr. Lundeen does not currently, nor has he ever, held a speciality in any medical discipline (Docket No. 25, Attachment 2).[4] By his own admission, Dr. Lundeen is not a specialist in CRPS (Docket No. 37, Attachment 1, p. 56 of 237).

Dr. Lundeen testified that, until 2010, he was conducting approximately 5,000 examinations annually (Docket No. 37, Attachment 1, p. 15 of 237). In 2010, his patient load was reduced to approximately 3,300 examinations annually (Docket No. 37, Attachment 1, p. 15 of 237).[5] Approximately eighty-five percent of Dr. Lundeen's practice was devoted to workers compensation claims and approximately fifteen percent was devoted to Medicare claims (Docket No. 37, Attachment 1, p. 80 of 237).

Aside from his lack of formal education in this area, Dr. Lundeen also lacks any further training in CRPS. At the time of his deposition, Dr. Lundeen had never given any lectures on CRPS (Docket No. 37, Attachment 1, p. 54 of 237). Nor had he attended any lectures specifically concerning CRPS in recent years, aside from a two-day board review course where Dr. Lundeen alleges "a couple of hours" were devoted to a discussion on CRPS [6] (Docket No. 37, pp. 55-56 of

---

[4] During his deposition, Dr. Lundeen stated he specializes in incontinence control, although there is nothing in the record to support this claim (Docket No. 37, Attachment 1, p. 56 of 237).

[5] Later in his testimony, Dr. Lundeen indicated he conducted approximately 180-190 examinations per week, which would total approximately 9,300-9,800 examinations per year (Docket No. 37, Attachment 1, pp. 24-25 of 237).

[6] According to Dr. Lundeen, other than the board review course, the most recent lecture he could remember attending regarding CRPS occurred ten to twelve years prior (Docket No. 37,

237).

Dr. Lundeen testified as to never having appeared as an expert in a case involving CRPS nor participated in any deposition regarding CRPS (Docket No. 37, Attachment 1, pp. 64-65 of 237). Additionally, Dr. Lundeen stated he had only testified as an expert in court regarding *any* medical subject matter twice in the past four years (Docket No. 37, Attachment 1, p. 15 of 237). This seems unusual, given that Dr. Lundeen performed, by his own admission, approximately 20,000 examinations during that same four-year time period (Docket No. 37, Attachment 1, p. 15 of 237). When viewed as a whole, Dr. Lundeen's education, knowledge, skill, and training with respect to CRPS fall far short of qualifying him as an expert in the matter, even given the normal relaxed application of Rule 702.

Plaintiff's more promising theory is to certify Dr. Lundeen as an expert in CRPS based on his experience diagnosing and treating the disease. A witness may be qualified by experience alone. *Cunningham*, 679 F.3d at 378. However, may does not mean must. "Whether a proposed expert's experience is sufficient to qualify . . . [him] to offer an opinion on a particular subject depends on the nature and extent of that experience." *Id*. at 379.

According to Dr. Lundeen, he has "personally examined, evaluated and/or diagnosed" approximately 103 individuals with CRPS since 1990 (Docket Nos. 37, Attachment 1, p. 7 of 237; Attachment 2). To supplement his deposition testimony, Dr. Lundeen submitted a printout of all patients he has ever either diagnosed or treated with CRPS (Docket No. 37, Attachment 2). Not only is Dr. Lundeen's tracking system extremely vague, consisting of only numbers to identify specific patients, further examination reveals duplication of at least four of these patient

Attachment 1, pp. 55-56 of 237).

16

numbers (Docket No. 37, Attachment 2). Furthermore, contrary to Plaintiff's belief, if Dr.

Lundeen's records are truly accurate and up to date, it appears he only saw *one* individual for

CRPS in 2011, not several, and the appointment was only for an evaluation[7] (Docket No. 37,

Attachment 2, p. 1 of 3). This is also in direct contravention of Dr. Lundeen's Sworn Statement,

taken June 14, 2011, in which Dr. Lundeen states:

> Mr. Graves:   Doctor, do you – this year, have you had several patients that you
> have diagnosed and are actively treating who have the condition of
> CRPS or regional complex pain syndrome?
>
> Dr. Lundeen:  I do.

(Docket No. 25, Attachment 1, p. 9 of 19).

Using the interpretation key provided by Dr. Lundeen during his deposition, of the 103

individuals he diagnosed with CRPS, he subsequently treated thirty-four of them for the disease

(Docket No. 37, Attachment 2). Dr. Lundeen's description of "treatment" is somewhat vague.

According to the doctor, he would send patients "out for physical therapy, bone scan, . . . try to

get a TENS unit for them. Try to get stellate ganglion blocks for them" (Docket No. 37,

Attachment 1, p. 58 of 237). Dr. Lundeen provides no basis for his diagnosis, specific treatment

plans, follow-up procedures, or long-term care plans for any of these patients, including Plaintiff.

Therefore, Dr. Lundeen's experience falls victim to the same fate as his education, skill, training,

and knowledge, at least where CRPS is concerned: it simply is not enough.

Finally, this Magistrate cannot ignore the current status of Dr. Lundeen's medical license.

On March 16, 2011, investigators from the State Medical Board of Ohio ("Ohio SMB" or the

---

[7] See Patient Claim Number 83-526942 (first seen 2/15/11) (Docket No. 37, Attachment
2, p. 1 of 3).

17

"Board") and other agencies conducted raids at Dr. Lundeen's Plymouth and Portsmouth, Ohio

offices (Docket No. 27, Attachment 3, p. 7 of 11).[8] Based on the Board's findings, as well as

those of the Ohio Bureau of Workers' Compensation ("BWC"), on May 11, 2011, Dr. Lundeen

was informed by the Ohio SMB that his license to practice medicine in the State of Ohio was

summarily suspended (Docket No. 27, Attachment 3, p. 5 of 11). The Board cited a variety of

infractions of the Ohio Revised Code committed by Dr. Lundeen from October 1977 through

March 2011 including:

> 1.  Failure to maintain minimal standards applicable to the selection or administration of drugs, or failure to employ acceptable scientific methods in the selection of drugs or other modalities for treatment of disease, in violation of O.R.C. § 4731.22(B)(2).
>
> 2.  A departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to a patient is established, in violation of O.R.C. § 4731.22(B)(6).
>
> 3.  Violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate, any provisions of this chapter or any rule promulgated by the board as that clause is used in § 4731.22(B)(2)

(Docket No. 27, Attachment 3, pp. 8-9 of 11). The State Medical Board also concluded Dr.

Lundeen's continued practice of medicine presented "a danger of immediate and serious harm to

the public" (Docket No. 27, Attachment 3, p. 3 of 11). Dr. Lundeen is no longer authorized to

---

[8] The raid revealed Dr. Lundeen failed to maintain his office in a clean, sanitary, and/or safe condition (Docket No. 27, Attachment 3, p. 8 of 11). The raid also uncovered evidence that Dr. Lundeen failed to "adequately or appropriately equip and/or supply [his] medical office in Plymouth, Ohio, with sufficient and/or appropriate equipment and supplies and/or in a readily available location to appropriately practice medicine and surgery" (Docket No. 27, Attachment 3, p. 8 of 11). News reports also indicated the BWC investigated Dr. Lundeen for fraud and prescription drug abuse (Docket No. 27, Attachment 2, p. 3 of 5).

18

practice medicine in the State of Ohio.[9]

Therefore, since Dr. Lundeen fails to possess either the knowledge, skill, experience, training, or education required of an expert witness under Fed. R. Evid. 702, this Magistrate has no choice but to strike the sworn statement of Dr. Lundeen, taken June 14, 2011, and disregard his report, issued February 27, 2011.

## C. RELIABILITY

Even if this Magistrate were to find Dr. Lundeen qualified as an expert in CRPS, Dr. Lundeen's sworn statement, final report, and deposition testimony still fail to meet the reliability criteria of *Daubert*. As stated previously, the Supreme Court assigned the trial court a gatekeeping function with regard to admitting expert testimony. *See Daubert*, 509 U.S. at 589; *see also Kumho Tire*, 526 U.S. at 137. This gatekeeping function allows the court to relax the first-hand knowledge requirement necessitated by Fed. R. Evid. 701 and allows an expert's opinion to be grounded in both relevance and reliability. *Daubert*, 509 U.S. at 591-92. To be relevant, expert testimony must "fit" the facts of the case, that is, "there must be a connection between the scientific research or test being offered and the disputed factual issues in the case in which the expert will testify." *Pride*, 218 F.3d at 578. For testimony to be reliable, the moving party must "establish by a preponderance of evidence that [the] expert's theories are reliable and adequately supported by sound technical data, methodology and testing." *Smelser*, 105 F.3d at

---

[9] It should also be noted that Dr. Lundeen stated during his deposition that he had received approval that very same day to hold a medical license in Indiana (Docket No. 37, Attachment 1, p. 203 of 237). On January 26, 2012, the Medical Licensing Board of Indiana ("Indiana MLB") voted to summarily suspend Dr. Lundeen's Indiana license, given the revocation of his Ohio license. On May 2, 2012, the Indiana MLB issued an indefinite suspension of Dr. Lundeen's medical license. Medical Licensing Board of Indiana, www.in.gov/pla/medical.htm.

19

303. This inquiry is flexible: there is no definitive or exhaustive list of factors to take into consideration. *Daubert*, 509 U.S. at 593.

On one hand, Dr. Lundeen did personally examine Plaintiff on two occasions: February 15, 2011, which was used as the basis for his February 27, 2011, report, and May 9, 2011 (Docket No. 37, Attachment 1, pp. 41-43 of 237). According to Dr. Lundeen, he followed the required diagnostic criteria set forth in the American Medical Association's Guide to the Evaluation of Permanent Impairment, Sixth Edition ("AMA Guide" or the "Guide")[10] when diagnosing Plaintiff with CRPS (Docket No. 37, Attachment 4, p. 14 of 14). Based on the evidence contained in the record, this appears to be correct.

On the other hand, additional evidence contained in the record seriously calls into question the reliability of Dr. Lundeen's assessment. To begin, and as noted by Judge Zouhary in his August 19, 2011, Memorandum Opinion and Order (Docket No. 32), Dr. Lundeen's incorporation of and reliance upon Wikipedia in his final report is troubling (Docket No. 25, Attachment 4, pp. 10-12 of 19). When asked why he chose to use Wikipedia as a primary source in a final medical report, Dr. Lundeen replied "I try to put a – put things in perspective. And this particular Wikipedia article has references to 49 very heady journal articles. Two of those authored – lead author is by Stanton-Hicks, former head of the department of pain management at Cleveland Clinic" (Docket No. 37, Attachment 1, p. 70 of 237). But upon further questioning, Dr. Lundeen admitted he never actually looked at those specific "heady journal articles,"

---

[10] The AMA Guide is an "international standard for impairment assessment" (Docket No. 37, Attachment 22, p. 4 of 21). The Guide was designed to "enhance the relevancy of impairment ratings, improve internal consistency, promote greater precision, and standardize the rating process" (Docket No. 37, Attachment 22, p. 4 of 21).

allegedly because he did not rely on Wikipedia in making his diagnosis of Plaintiff's condition (Docket No. 37, Attachment 1, pp. 70-71 of 237). Dr. Lundeen admitted it was his decision to include references to Wikipedia in his final report (Docket No. 37, Attachment 1, p. 34 of 237), despite knowing the information on Wikipedia can change daily and may contain inaccurate information (Docket No. 37, Attachment 1, pp. 113-15 of 237). It cannot be determined from the record whether Dr. Lundeen merely used Wikipedia as a source in his report or whether he actually used it as a basis for his diagnosis. Either approach is troubling.

Dr. Lundeen also admitted to only reviewing Plaintiff's *post-accident* medical records prior to issuing his February 2011 report (Docket No. 37, Attachment 1, pp. 40-41 of 237), and admitted to only seeing Plaintiff's full medical records, including both pre and post-accident documentation, the day before his deposition (Docket No. 37, Attachment 1, p, 21 of 237). Plaintiff's medical history, both physical and mental, is lengthy, to say the least. Plaintiff admits to being both physically and sexually abused as a child at the hands of her mother and maternal grandfather (Docket No. 23, Attachment 3, p. 6 of 29). At age 12, Plaintiff suffered an intracranial bleed in the right hemisphere of her brain (Docket No. 25, Attachment 3, p. 32 of 63). In 1979, Plaintiff experienced a very large right parietal-occipital Arterial Venous Malformation ("AVM"), which was resected at Ohio State Medical Center (Docket No. 25, Attachment 3, p. 32 of 63). This resection was complicated by a post-operative hemorrhage and a second craniotomy and seizure disorder (Docket No. 25, Attachment 3, p. 32 of 63). Plaintiff was ultimately left with a very dystonic left upper extremity without any significant weakness (Docket No. 25, Attachment 3, p. 32 of 63). She has since had problems with sleep paralysis, periodic limb movements of sleep, stabbing headaches, hemidystonia of the left arm, depression,

and severe obstructive sleep apnea (Docket No. 25, Attachment 3, p. 32 of 63). Plaintiff also

suffers from congenital jerk-type nystagmus, bilateral optic atrophy due to small optic nerves, a

non-paralytic exotropia of the right eye, and chronic facial pain (Docket No. 25, Attachment 3, p.

32 of 63). Plaintiff has been diagnosed and treated for endometriosis, abnormal blood cells,

irritable bowel syndrome, and has had basal cell cancers removed (Docket No. 23, Attachment 5,

p. 10 of 11). As of 2009, and likely through at least early 2011, Plaintiff was on numerous

medications for a variety of conditions, including psychiatric disorders (Vicodin, Wellbutrin,

Cymbalta), seizure disorders (Klonopin), high cholesterol (Lipitor), irritable bowel syndrome

(Bentyl, Levsin), sleep apnea/narcolepsy (Provigil), allergies (Phenergan, Naxonex, Singular,

Allegra), and asthma (Singular) (Docket No. 25, Attachment 3, p. 59 of 63). Dr. Lundeen makes

no reference to these medications in his report, noting only that Plaintiff was taking over-the-

counter Motrin, Tylenol, and Advil (Docket No. 37, Attachment 1, p. 1 of 4). When asked,

however, Dr. Lundeen did admit that examination of Plaintiff's prior medical records would

have been helpful, although allegedly the information would not have changed his overall

opinion (Docket No. 37, Attachment 1, p. 182 of 237).

Not only did Dr. Lundeen not examine Plaintiff's pre-accident medical history, he did not

even examine her complete *post-accident* history. Although Dr. Lundeen made reference to the

conclusions of some of Plaintiff's other physicians in his report, he failed to address the fact that

he was missing approximately sixteen months of Plaintiff's post-accident medical records

(Docket No. 37, Attachment 4, pp. 1-14 of 14). When Defendant's attorney asked Dr. Lundeen

about the gap in medical records from August 3, 2009, to December 9, 2010, Dr. Lundeen

indicated he never inquired of Plaintiff as to what occurred during those sixteen months (Docket

No. 37, Attachment 1, pp. 112-13 of 237).

Dr. Lundeen makes no reference to Plaintiff's psychiatric history, either. When asked if he was aware of the psychological records of Dr. Linda Myerholtz, who diagnosed Plaintiff with a possible conversion disorder and noted Plaintiff's "continued pain and functional impairments appear to be either neurological or possibly psychological in origin," Dr. Lundeen stated he was not (Docket No. 37, Attachment 1, pp. 147-54 of 237). When asked if he was aware of the clinical records from Dr. Marcia Ward, a clinical psychologist who diagnosed Plaintiff with an adjustment disorder, Dr. Lundeen stated he was not (Docket No. 37, Attachment 1, pp. 159-60 of 237). When asked if he had seen Plaintiff's January 2011 discharge summary from Mercy Saint Vincent's Hospital which indicated Plaintiff was on multiple psychiatric medications, and was not complaining of pain, numbness or tingling, and was capable of a full range of motion mere weeks before Dr. Lundeen's evaluation, Dr. Lundeen testified he had not examined those records, either (Docket No. 37, Attachment 1, pp. 163, 195-97 of 237).

Even more striking is Dr. Lundeen's disregard of established medical guidelines. According to the AMA Guide, a diagnosis of CRPS may only be rated when:

> (1) the diagnosis is confirmed by objective parameters . . . (2) the diagnosis has been present for at least 1 year (to ensure accuracy of the diagnosis and to permit adequate time to achieve MMI), (3) the diagnosis has been verified by more than 1 physician, and (4) a comprehensive differential diagnostic process (which may include psychological evaluation and psychological testing) has clearly ruled out all other differential diagnoses. Emphasis is placed on the differential diagnostic process because accurate diagnosis of [CRPS] is difficult and because even objective findings have been demonstrated to lack diagnostic validity.

(Docket No. 37, Attachment 22, p. 18 of 21). The Guidelines also require an evaluator to take into consideration a patient's relevant history by reviewing both the patient's "*past* medical history and the patient's presentation of the current history" (Docket No. 37, Attachment 22, p.

23

12 of 21) (emphasis added). The Guidelines go on to state "it is important to review medical records *before* performing an impairment rating" (Docket No. 37, Attachment 22, p. 12 of 21) (emphasis in original). When asked about the Guidelines' emphasis on taking a patient's pre and post-accident medical history, Dr. Lundeen seemed to dismiss the importance of this practice, admitting he did not follow the Guidelines when evaluating Plaintiff's condition, viewing the treatise merely as a "guide[] and not rules" (Docket No. 37, Attachment 1, p. 183 of 237).

Not only is Dr. Lundeen's disregard for the Guidelines evident in his failure to obtain Plaintiff's complete medical history, it is also apparent in the way he diagnosed Plaintiff. The Guidelines require a diagnosis of CRPS be confirmed by objective evidence (Docket No. 37, Attachment 22, p. 18 of 21). Dr. Lundeen allegedly took pictures of Plaintiff in February 2011 to document her diagnosis of CRPS (Docket No. 37, Attachment 1, pp. 115-16 of 237). However, according to Dr. Lundeen, he never took the pictures off his phone camera, which has since been seized by officials investigating Dr. Lundeen's medical practice (Docket No. 37, Attachment 1, pp. 46, 115-16 of 237).

The Guidelines also require a patient meet certain diagnostic criteria before a diagnosis is confirmed. One of these criterion is a positive bone scan (Docket No. 37, Attachment 22, p. 20 of 21). Plaintiff underwent a bone scan on July 17, 2008, which was negative for CRPS (Docket No. 23, Attachment 2, p. 5 of 8). Dr. Lundeen testified that he was aware of these results at the time he made his final report (Docket No. 37, Attachment 1, p. 59 of 237). When asked why he still made a CRPS diagnosis despite this negative bone scan, Dr. Lundeen stated a "negative bone scan, if somebody has CRPS, can be at a – at a time in the progression of it where it's not going to be diagnostic. But there are times – there are opportunities, if it's early enough on,

24

you're gonna light up. It becomes more chronic and – where's it a more chronic and steady state, you're not gonna – it's not gonna help you make the diagnosis" (Docket No. 37, Attachment 1, p. 60 of 237). Plaintiff underwent a bone scan only three months after her accident (Docket No. 23, Attachment 2, p. 5 of 8). It is highly unlikely Plaintiff's condition had become chronic in such a short period of time. Therefore, Plaintiff's scan should have "lit up" if CRPS was present. Further, the Guidelines require a diagnosis of CRPS to be confirmed by more than one physician (Docket No. 37, Attachment 22, p. 18 of 21). None of Plaintiff's other treating or evaluating physicians, most of whom are neurologists or pain management specialists, found the presence of CRPS in Plaintiff.

Finally, it must be noted that Plaintiff was referred to Dr. Lundeen not by one of her other treating physicians, but by her attorney (Docket No. 37, Attachment 1, p. 81 of 237). Although not dispositive, the Sixth Circuit in *Newell*, discussed *supra*, found a purported expert's opinion that was prepared solely for litigation to be a "red flag" in terms of *Daubert* reliability. *See Newell*, 676 F.3d at 527. Dr. Lundeen was instructed to do an IME of Plaintiff with the end goal being to find the presence of CRPS caused by Plaintiff's injury. Although not dispositive, this certainly creates some doubt as to the reliability of Dr. Lundeen's opinion. This is accentuated even further by Dr. Lundeen's own admission that he often received cases because he was "quick about diagnosis" (Docket No. 37, Attachment 1, p. 57 of 237).

Based on the record in its entirety, even if this Magistrate were to find Dr. Lundeen to be an expert in CRPS, Dr. Lundeen's proposed testimony fails to satisfy the relevancy and reliability conditions required by *Daubert*. Therefore, this Magistrate finds Dr. Lundeen fails to qualify as an expert in this matter.

25

## VI. CONCLUSION

Having carefully examined the Plaintiff's expert report in light of Federal Rule of Evidence 702 and the requirements set forth in *Daubert*, this Magistrate concludes that the proposed expert, Dr. James E. Lundeen, does not have "specialized knowledge [that] will assist the trier of fact" in this case involving CRPS and, further, that the testimony that would be offered by Dr. Lundeen is not the "product of reliable principles and methods . . . applied . . . reliably to the facts of the case." Fed. R. Evid. 702. Accordingly, Defendant's Motion to Strike is granted.

<u>/s/ Vernelis K. Armstrong</u>
United States Magistrate Judge

Date:   September 27, 2012